**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **SPARTAN MEDICAL INC.,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v** | § | |
| | § | **CIVIL ACTION NO. _____** |
| **GLOBUS MEDICAL, INC. and** | § | |
| **TISSUE TRANSPLANT** | § | |
| **TECHNOLOGY, LTD dba BONE** | § | |
| **BANK ALLOGRAFTS,** | § | |
| **Defendants.** | § | **JURY TRIAL DEMANDED** |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff SPARTAN MEDICAL INC. ("Plaintiff" or "Spartan"), by and through its undersigned counsel, complains of Defendants GLOBUS MEDICAL, INC. ("Globus"), and TISSUE TRANSPLANT TECHNOLOGY, LTD dba BONE BANK ALLOGRAFTS ("BBA") (collectively "Defendants") and alleges as follows:

### I.      NATURE OF THE ACTION

1.       In a time of war where the United States of America is committed to containing threats against its allies and the Homeland, Defendants are illegally disrupting Plaintiff's supply contract with the US Department of Veterans Affairs ("VA") and Department of Defense ("DoD") to provide critically needed medical tissue products used at first response military hospitals servicing men and women injured in the theater of combat, and at critical care facilities at home. BBA's rationale for its unconscionable conduct is that it wants its distributors to sell these same life-saving commodities to the US military through affiliated entities at margins significantly above what Plaintiff Spartan, a Service-Disabled Veteran-Owned Small Business, has contractually agreed to sell.

## II.    JURISDICTION AND VENUE

2.    This Court has original federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C §1331 because Plaintiff has asserted of a cause of action arising under the laws of the United States, specifically under Section 4 of the Sherman Act, 15 U.S.C. § 4.

3.    This Court also has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C §1332(a). Plaintiff Spartan Medical is a Maryland corporation with its principal place of business in Maryland. Defendant Globus Medical, Inc. is a Delaware corporation with its principal place of business in Pennsylvania. Defendant Tissue Transplant Technology, Ltd. d/b/a Bone Bank Allografts ("BBA") is a Texas limited liability partnership that is now wholly owned by T-TOTS, LLC, a Texas limited liability company, which itself is wholly owned by Defendant Globus Medical, Inc.

4.    This Court also has supplemental jurisdiction under 28 U.S.C §1367 to hear Plaintiff's other causes of action, all of which are so related that they form part of the same case or controversy under Article III of the United States Constitution.

5.    This Court has personal jurisdiction over Defendants as Defendants are in and carry on their business in the State of Texas; Defendant BBA is headquartered in Bexar County within the Western District of Texas.

6.    Venue in this Judicial District is proper under 28 U.S.C. § 1391(b). Venue in this Judicial District is proper under 18 U.S.C. § 1965(b).

## III.    PARTIES

7.     Plaintiff Spartan Medical Inc. ("Spartan") is a Service-Disabled Veteran-Owned Small Business incorporated in the State of Maryland with its principal place of business located at 12200 Tech Road, Suite 120, Silver Spring, Maryland 20904.

8.     Defendant Globus Medical, Inc. ("Globus"), is a Delaware Corporation with its principal offices at Valley Forge Business Center, 2560 General Armistead Avenue, Audubon, Pennsylvania 19403. Globus may be served through its registered agent, Corporation Service Company, at 251 Little Falls Drive, Wilmington, Delaware 19808.

9.     Defendant Tissue Transplant Technology, Ltd. d/b/a Bone Bank Allografts. ("BBA") is a limited partnership of which Globus is a partner. BBA's principal place of business is in Texas, located at 4808 Research Drive, San Antonio, Texas 78240. BBA may be served through registered agent Joe M. Mims located at 4808 Research Drive, San Antonio, Texas 78240.

## IV.     FACTS

10.     Plaintiff Spartan is a certified Service-Disabled Veteran-Owned Small Business that provides advanced medical technologies to medical centers, surgeons, and clinician partners worldwide. Exhibit 1 (SDVOSB Verification).[1] Spartan currently provides medical products and surgical implants to civilian, military, and government owned hospitals and providers. These include facilities such as Walter Reed National Military Medical Center, William Beaumont Army Medical Center, Landstuhl Regional Medical Center, Eisenhower Army Medical Center, and the San Antonio Military Medical Center. Spartan provides one of the broadest lines of advanced surgical solutions and allograft tissues used in medical procedures.

11.     Defendant Globus Medical, Inc. is a publicly traded company that manufactures medical devices. On or about December 2014-January 2015, Globus acquired BBA. Exhibit 2

---

[1] All exhibits are incorporated by reference.

(email discussing purchase).  On May 2, 2016, Globus, as the parent of BBA, entered into a Nondisclosure Agreement (NDA) with Spartan. Exhibit 3. The purpose of the NDA was to protect any confidential information while the parties explored a possibility of doing business together.

12.     On May 12, 2016, BBA emailed Spartan its available amnion-based grafts and stated it was preparing a fee schedule for Spartan to provide to a major Army medical center. Exhibit 4.

13.     On June 1, 2016, BBA and Spartan entered into a Distribution Agreement. Exhibit 5. The Distribution Agreement authorized Spartan to provide marketing services, sales development, and distribution services for certain BBA products to health care institutions. The initial term of the Distribution Agreement was one year with automatic renewal periods for successive one-year periods. Under the initial Distribution Agreement, Spartan would order products from BBA and promptly pay them within thirty (30) days of the invoice date. BBA would then load the product onto Spartan's carrier in San Antonio, Texas. BBA was responsible for packing, marking, labeling the products, and obtaining export clearance and licenses. Exhibit 5 (Product List and Fee Schedule).

14.     On June 6, 2016, BBA provided Spartan with all its regulatory compliance documentation to make available to Spartan's customers. Exhibit 6.

15.     On September 1, 2016, BBA and Spartan entered into a Private Label Agreement, wherein Spartan would provide distribution services, including but not limited to marketing, sales development, and distribution services for certain BBA products to health care institutions. Exhibit 7.

*Plaintiff's Original Complaint*

16.     On June 6, 2017, BBA and Spartan executed an amendment to the Distribution Agreement to add six new line items for two products, Amnios RT Acellular Liquid Amnion and Amnios Cryopreserved Liquid Amnion. Exhibit 8 (email) & Exhibit 9 (First Amendment ).

17.     In the email providing the amendment, BBA stated, "Hope all goes well at SAMMC (San Antonio Military Medical Center)." Exhibit 8. BBA knew that Spartan was providing these products to the DoD and military medical centers, encouraged Spartan to do so, and offered to facilitate such sales relationships.

18.     On June 12, 2017, BBA provided Spartan with a countersigned amendment and stated its willingness to assist in the conversion from other allografts as well as "continue to aid" Spartan's growth with BBA. Exhibit 10.

19.     On June 15, 2017, BBA provided Spartan with its new catalog and asked to be notified how SAMMC worked out and if they can be of any assistance in any way.  Exhibit 11.

20.     On August 1, 2017, the parties entered into a second amendment to add two line-items of SteriFlex to the agreement. Exhibit 12 (Second Amendment).

21.     In the email with the amendment, BBA congratulated Spartan for its accomplishments within SAMMC. Exhibit 13. In the email, BBA stated it was looking forward to seeing SpartanFuse DBM putty, a product licensed by Spartan from BBA, to go into use as well as other BBA labeled allografts. BBA stated it would be reenacting two product codes that were comparable to the cortical wrap from Spartan's current vendor, thereby transferring active business from Spartan's vendors to BBA.

22.     On October 10, 2017, the parties entered into a rider to the Distribution Agreement to add additional restrictions related to the distribution of certain SteriFlo products in exchange for adding SteriFlo allografts to the list of products Spartan distributes. Exhibit 14 (Rider to

*Plaintiff's Original Complaint*

Distribution Agreement). The restrictions included shipping SteriFlo directly to the end users. The Rider specified that SteriFlo was not to be shipped or used in surgical settings, only clinical settings, and allowed BBA to terminate Spartan's right to distribute SteriFlo if the product was found in a surgical setting.

23.    At the same time, the parties entered into a third amendment to add three line-items of SteriFlo Acellular Liquid Amnion to the agreement. Exhibit 15 (Third Amendment).

24.    At this point, BBA began shipping certain products to end users, including those under DoD blanket purchase agreements and military hospitals.

25.    On or around May 2018, Spartan was informed by some of its buyers that Distribution and Pricing Agreement Registration Agreements (DAPA) were the preferred purchasing vehicle of the DoD. In order to receive approval from the DoD to supply products via DAPA, the products must go through the full due diligence process required by the federal government to ensure quality, regulatory control, best value to the government assessment and comparison, and be approved and certified.

26.    Additionally, the Veteran's Administration issued solicitation 36C10G18R0003 for biologics, also known as the National Biologics IDIQ (Indefinite Delivery Indefinite Quantity) Contract ("National Contract"), with a closing date of May 30, 2018. Exhibit 16. The VA required bidders under the proposal for the National Contract to provide a letter of commitment for biologics products required by the VA. The VA had set aside $2.1 billion for each potential supplier of these highly demanded products.

27.    Spartan began the grueling and time-consuming application process for the National Contract. The application consisted of four volumes and required Spartan to not only verify and demonstrate that it could meet the technical requirements of the contract, but also prove

the efficacy and value of its products and to provide a proven track record of business with the federal government as a viable long-term supplier. Spartan's general counsel, outside counsel, government relations consultants, and other employees spent several hundred combined hours over the course of the year working on the application for the largest biologics award ever in the federal government. Exhibits 17.a.-17.d. (Spartan Medical Response to Request for Proposal Volumes 1-4).

28.     Spartan immediately communicated with BBA about obtaining a Letter of Commitment. On May 14, 2018, BBA issued that letter to Spartan stating that:

> "In the event that Spartan Medical is awarded an Indefinite Delivery Indefinite Quantity ("IDIQ") contract by the Government under the above-referenced Solicitation, this letter hereby affirms and certifies that Spartan Medical, located in Silver Spring, Maryland, is an authorized Government distributor of the biological implants identified in "Attachment 3" to the Solicitation for the entire contract period of performance, including option periods, if applicable and if exercised. The Manufacturer hereby affirms that Spartan Medical has an uninterrupted source of supply, with sufficient quantities of product, for the duration of the base contract period and all option years, provided that said Spartan Medical remains in good standing with Manufacturer and adheres to all the Original Equipment Manufacturer Partner Agreements."

Exhibit 18.

29.     Furthermore, in that letter, BBA authorized Spartan to distribute to hospitals and medical centers "operated by or affiliated with the United States Department of Veterans Affairs and/or the United States Department of Defense nationwide." Exhibit 18. This allowed BBA to gain entry to the DoD's preferred contracting and acquisition vehicles, DAPA.

30.     On July 4, 2018, the parties entered into a fourth amendment to the Distribution Agreement to add four line-items of SteriScaf Demineralized Cortical Fiber to the agreement. Exhibit 19 (Fourth Amendment).

31.     On September 26, 2018, Spartan was notified that it was awarded the National Contract and began supplying BBA products to VA Hospitals in accordance with the National

Contract. Exhibit 16. Spartan was one of 22 companies awarded the largest biologics contract ever awarded by the Department of Veterans Affairs, the largest healthcare provider in the world. This national contract for 5-years has allocated over $2.1B of spending for biologics including Spartan Medical's complete biologics product portfolio.

32.    This fulfilled the condition precedent to the May 14, 2018 letter modifying the agreements. The period of performance for the contract was 60 months beginning in September 2018 and ending in September 2023. Exhibit 20a-20d.

33.    In addition to the National Contract, Spartan was awarded a DAPA contract on July 30, 2019. Exhibit 21. Nonetheless, and despite its commitment to provide an uninterrupted supply, on October 25, 2019, BBA sent the following via email:

> "Effective immediately, BBA requires that you cease use of BBA product codes or product numbers for business or sales opportunities with Department of Defense through the Defense Logistics Agency's Distribution and Pricing Agreement (DAPA) and Electronic Catalog (ECAT) programs. If you have any questions, please call me. Otherwise, please confirm that you will comply with this requirement by responding to this email."

Exhibit 22. Spartan responded asking for a formal demand letter that was never received.

34.    Thereafter, Spartan reminded BBA of the provisions from the Letter of Commitment. Specifically, Spartan quoted the letter saying:

> "Spartan Medical is authorized to distribute Manufacturer's products in hospitals, clinics, surgery centers, outpatient/inpatient facilities, military treatment facilities and/or veterans medical centers operated by or affiliated with the United States Department of Veterans Affairs and/or the United States Department of Defense nationwide. Spartan Medical has full authority to market, promote, distribute, sell and offer technical assistance for Manufacturer biological implants identified in Attachment 3 to the Solicitation".

Exhibit 23.

35.    On November 20, 2019, BBA sent two letters terminating the Private Label Agreement and Distribution Agreement, effective January 19, 2020. Exhibit 24 (Termination of

Distribution Agreement); Exhibit 25 (Termination of Private Label Distribution Agreement). The termination letters included citations to the sections of the agreements for termination without cause, which requires sixty (60) days' notice. However, because the Letter of Commitment modified the Distribution Agreement and Private Label Agreement and promised Spartan an uninterrupted source of supply in sufficient quantities to meet the VA's needs, the contracts could not be terminated without cause.

36.     On December 5, 2019, after discussing the termination with BBA by phone, Spartan followed up by email to clarify the situation and attached the full list of Spartan's contracted Federal Government line items from BBA. Exhibit 26. Spartan explained that the contracts only referenced either the contract line item number or DAPA line item numbers, for the VA and DoD, when orders are placed. Spartan asserted that the confusion may lie between the parties when the order is physically being placed with BBA for delivery, after it is received from the government directly to Spartan via the terms of the contracts. After the order is received via one of the contracts, Spartan would convert the orders to OEM and place the order with BBA. The government was never the direct purchaser. Spartan would purchase from BBA as it had done so since the beginning of their relationship. The government purchasers only see Spartan line-item numbers. Spartan ended the email by stating that the parties had a great partnership for many years and were looking forward to continuing to grow the business together. Spartan intended to address BBA's concerns directly as it had never seen these concerns in its constant engagement with the contractors or the contracting vehicles.

37.     On December 12, 2019, Spartan followed up on its previous email and informed BBA that it had just converted another VA medical center to SpartanFuse 1000 and that Spartan wanted to keep the momentum going. Exhibit 26.

38.     On December 16, 2019, BBA responded by stating that pursuant to the agreements, each party has the right to terminate the agreements on multiple grounds including sixty (60) days' written notice for any reason. Exhibit 26. BBA further stated that it was not satisfied with their relationship for various reasons over the recent months, including the limited volume and the tone of communications from Spartan. As a result, BBA stated it was choosing to exercise its contractual right to terminate the agreements. BBA expected Spartan to be happier working with other suppliers due to Spartan's reference to other suppliers and that BBA's way of doing business does not work for Spartan. BBA noted that it would honor Spartan's orders through the termination date and expect Spartan to notify the government and any other third parties to ensure that, after the termination date of the agreements, no more orders are directed to BBA through Spartan, contracts between BBA and Spartan have terminated, and there is no more association between Spartan and BBA with any of Spartan's customer's supply schedules or systems. Nothing in any of BBA's communications suggested the contracts were being terminated because Spartan had violated the terms of the contracts or otherwise failed to meet its obligations under the contracts.

39.     Spartan replied by asking for clarifications and its expectations upon termination. Exhibit 26. Spartan asked for a refund for all non-SpartanFuse items that Spartan had paid for, but not received, and asked all SpartanFuse items currently made be shipped to another tissue bank.

40.     On December 18, 2019, BBA replied with its willingness to ensure a smooth transition. Exhibit 26. BBA's email noted the outstanding balance on the account and the number of SpartanFuse boxes in its inventory. BBA inquired about where to send the SpartanFuse products and the hold payment placed on BBA invoices by Spartan.

41.     Spartan replied with the logic of withholding payment without any knowledge of what BBA intended to do with Spartan's inventory. Spartan stated that it did not know that a simple

DAPA request would turn into a global no-cause termination in direct breach of the contract. Spartan promised to pay the overdue balance. Furthermore, the email stated:

> "Spartan Medical reserves all of its rights and remedies under our agreements, amendments, promises, contracts, and commitments (to include but not limited to a $2.1 Billion competed VA IDIQ Biologics National Contract in which we relied on BBA/Globus's 5-year indefinite supply guarantee to fill limited line items based on that ironclad signed commitment) and at law or equity with respect to (but not limited to) these matters."

Exhibit 26.

42.     On December 21, 2019, Spartan provided a letter responding to the two termination letters. Exhibit 27. Spartan stated that on May 14, 2018, BBA proposed that both of the agreements would be modified so that the termination section would be rendered null and void if Spartan was awarded a national contract pursuant to the solicitation. This meant that BBA could only terminate the agreements if Spartan became subject to bankruptcy or if Spartan materially breached the agreement and did not remedy within thirty (30) days of notice of the breach. Spartan insisted on its good standing with BBA and adherence to all agreements. Spartan warned that if BBA refused to supply Spartan with products or fulfill orders on or after January 19, 2020 then BBA would be in material breach of the agreements which will cause Spartan to experience significant damage. Changing and removing the products from the National Contract would place the entire award at risk. Spartan asked that BBA reconsider its position and that if BBA insisted on ending the relationship then BBA needed to extend some consideration to Spartan for the modification of the agreements, additional time needed to make necessary steps to negotiate a removal and replacement of BBA products on the national contract, and secure viable alternatives.

43.     On January 7, 2020, Spartan asked whether BBA would grant an extension of time to Spartan for the termination of the contracts. Exhibit 28. Spartan informed BBA that it had been researching the contract provisions concerning removing/replacing BBA products from the

National Contract. Spartan, again, insisted on its willingness to work out a solution to the issues that would enable BBA and Spartan to salvage their business relationship.

44.      BBA replied offering to continue fulfilling any orders through the VA contract, DAPA, or non-government hospital sales of SpartanFuse, continue to fulfill any orders pursuant to the VA contract for products listed with a contract line item number, continue to fulfill any order for SpartanFuse or BBA products to non-government hospitals, and lastly require Spartan initiate a process to remove non-private label products on DAPA prior to January 19, 2020. Exhibit 28. BBA did not offer to extend the termination date to allow Spartan to secure alternative sources of supply so that its contractual commitments on the National Contract and DAPA would be uninterrupted.

45.      On January 9, 2020, Spartan responded and pleaded with BBA to keep the products on DAPA. Exhibit 28. Spartan then asked for the contact information of another distributor of BBA products that was upset that recent DAPA sales may have defaulted to Spartan. Spartan insisted on finding a solution with both the other distributor and BBA.

46.      On January 10, 2020, BBA responded that it is not willing to connect Spartan with its other distributors. Exhibit 28.

47.      On January 12, 2020, Spartan again asked to bring all interested parties to the table. Exhibit 29. Spartan explained that it offered the DoD a better price for BBA products than the other distributors who may also sell the products through DAPA or another purchasing vehicle, which may have resulted in those orders defaulting to DAPA (as the lowest price on DAPA). Another distributor or distributors had complained to BBA about it, wanting BBA to find a solution. Apparently, BBA's solution was to demand that Spartan remove the products off DAPA.

Spartan stated its eagerness to compensate all parties fairly based on whom drives, supports, markets, and grow their mutual business interests.

48.     Finally, on January 13, 2020, BBA issued a letter to follow up on the correspondence over the previous weeks. Exhibit 30. BBA restated that it has issued its proposal that fully addresses any concerns Spartan may have regarding its national contract with the VA. BBA stated that it was not extending the termination date. BBA expressed its opinion that the Letter of Commitment did not render the agreements non-terminable, modify the clear termination rights set forth in the agreements, and that the letter was in reference to the VA contract only. Lastly, regarding Spartan's request for other BBA distributors, BBA stated that:

> "Simply put, we [BBA] are unwilling to have distributors who sell our products to the U.S. Government and other customers, in direct competition with each other, to engage in exploratory pricing-or compensation-related discussions regarding what you [Spartan] call 'mutual business interests' associated with those sales."

49.     Spartan replied that the only issue arose when Spartan started selling products to the DoD via DAPA. Exhibit 31. Spartan expressed its inability to understand the reasoning behind BBA not wanting to sell products on DAPA. Spartan acknowledged that the real conflict lay between them and another distributor, not BBA.

## V.     CAUSES OF ACTION

### Count One: Violations of the Sherman Antitrust Act, § 1, 15 U.S.C.A. § 1.

50.     Plaintiffs hereby adopt and re-allege each and every allegation previously set forth in Paragraphs 1 through 49 of this Complaint as if fully set forth herein.

51.     The Sherman Antitrust Act was developed by the U.S. government to protect consumers from predatory business practices, and to ensure that fair competition exists in an open-market economy.

52.     BBA and its parent company, Globus, entered into a continuing agreement, understanding, combination and/or conspiracy with its distributors in restraint of trade, resulting in harm both to competition generally and to Plaintiff specifically, in violation of Section 1 of the Sherman Act. Defendants terminated the Distribution Agreement and Private Label Agreement to prevent Spartan from selling BBA product on DAPA and ECAT so that its other distributors could sell at a significantly higher price, thereby harming the market, consumers, and Plaintiff. This is price-fixing, a *per se* violation of the Sherman Act.

53.     Alternatively, BBA and its parent company, Globus, entered into a continuing agreement, understanding, combination and/or conspiracy in restraint of trade with other distributors where those distributors would sell Globus medical equipment and BBA products. The sale of BBA biologics was tied to the sale of Globus medical equipment; the distributors would not sell BBA biologic product independently of Globus medical equipment. This is unlawful tying and a *per se* violation of the Sherman Act. Furthermore, in the absence of an explicit tying agreement, conditioning can be inferred from evidence indicating that the supplier has actually coerced the purchase or in this case, the non-purchase of another product.

54.     Spartan has suffered an antitrust injury and it is an efficient enforcer of the antitrust laws. The anticompetitive actions of Defendants and the agreement entered to between Defendants and their distributors injure Plaintiff's business and are the very same anticompetitive practices that the antitrust laws were intended to prevent and have led to actual injury suffered by Plaintiff.

55.     The antitrust laws entitle Plaintiff to actual damages, injunctive relief, as well as treble damages and attorneys' fees.

### Count Two: Specific Performance Under the Distribution Agreement

56.     Plaintiffs hereby adopt and re-allege each and every allegation previously set forth in Paragraphs 1 through 49 of this Complaint as if fully set forth herein.

57.     Distribution agreements are generally controlled by the UCC. When parties enter into a contract for the sale of goods, the UCC controls the conduct of the parties.

58.     UCC § 2-610 states that when a party repudiates a contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may await performance or resort to any remedy for breach, even though he has notified the repudiating party that we would await the latter's performance and has urged retraction. UCC § 2-711 states where the seller repudiates, the buyer may obtain the remedy of specific performance.

59.     BBA has repudiated the Distribution Agreement and Letter of Commitment. Spartan seeks specific performance of BBA's obligations.

### Count Three: Anticipatory Breach of Contract

60.     Plaintiffs hereby adopt and re-allege each and every allegation previously set forth in Paragraphs 1 through 49 of this Complaint as if fully set forth herein.

61.     An anticipatory breach of contract is one committed before the time when there is a duty of performance and results from words or conduct indicating an intention to refuse performance in the future.

62.     To bring an anticipatory breach of contract claim, a plaintiff must show: (1) an absolute repudiation of the obligation; (2) a lack of a just excuse for the repudiation; and (3) damage to the non-repudiating party.

63.     When a party has repudiated an agreement, the other party may accept the agreement as being terminated or consider the repudiation as a breach of contract and bring suit for damages.

64.     Here, Defendants repudiated the agreement on October 25, 2019 by indicating they would refuse to perform in the future by disallowing the further sale of BBA products on DAPA contracts.

65.     Defendants gave no reason for this unexpected withdrawal. Defendants knew that BBA was selling to the VA and DoD through blanket purchasing agreements prior to BBA's insistence it stop the use of DAPA. Furthermore, Defendants gave Spartan a Letter of Commitment in reference to the VA solicitation ensuring that they would provide an uninterrupted source of supply, with sufficient quantities of the product, for the duration of the VA base contract period and all option years.

66.     Plaintiff has suffered damages as a result of this repudiation.

### Count Four: Breach of Contract

67.     Plaintiffs hereby adopt and re-allege each and every allegation previously set forth in Paragraphs 1 through 49 of this Complaint as if fully set forth herein.

68.     To bring a breach of contract claim, a plaintiff must show: (1) there is a valid contract between the plaintiff and the defendant, (2) performance or tender of performance by the plaintiff, (3) breach by the defendant, and (4) damage to the plaintiff as a result of the breach.

69.     Plaintiff and Defendant entered into a valid, binding and enforceable written contract on June 1, 2016, wherein Defendant would supply medical biological tissues and Plaintiff would pay Defendant for those goods and distribute them.

70.     Plaintiff performed under the contract by tendering the invoice amount each time it placed an order.

71.     Defendant breached the contract by repudiating the contract on October 25, 2019 by expressing its unwillingness to supply products under DAPA contracts as it had done before.

72.     Plaintiff has suffered injury due to Defendant's breach.

### Count Five: Fraud

73.     Plaintiffs hereby adopt and re-allege each and every allegation previously set forth in Paragraphs 1 through 49 of this Complaint as if fully set forth herein.

74.     To bring a fraud claim, a plaintiff must show: (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

75.     BBA made a material representation that it would provide "an uninterrupted source of supply, with sufficient quantities of product, for the duration of the base contract period and all option years".

76.     BBA has now attempted to retract that statement and will not allow Spartan to provide these items to the DoD through DAPA contracts.

77.     BBA either knew the representation was false when made or made the representation recklessly by making the definite assertion that it would provide an uninterrupted source of product for the duration of the contract period without knowledge as to its truth.

78.     BBA made the representation with the intent that Spartan would obtain the VA contract because it was necessary for Spartan to have a constant and never-ending supply of products.

79.     Spartan was awarded the VA contract and began servicing VA medical facilities under the contract.

80.     Plaintiff has suffered injury due to Defendant's fraudulent actions.

### Count Six: Tortious Interference with Existing Contract

81.     Plaintiffs hereby adopt and re-allege each and every allegation previously set forth in Paragraphs 1 through 49 of this Complaint as if fully set forth herein.

82.     To establish a claim for tortious interference the Plaintiff must establish (1) the existence of a contract subject to interference, (2) the occurrence of an act of interference that was willful and intentional, (3) the act was a proximate cause of the plaintiff's damage, and (4) actual damage or loss occurred.

83.     Plaintiff has existing contracts with the VA and DoD.

84.     Defendants knew about the existence of the agreements because they congratulated them on previous blanket purchase agreements and then offered to provide "an uninterrupted source of supply, with sufficient quantities of product, for the duration of the base contract period and all option years".

85.     Defendants willfully and intentionally interfered with the agreements by ceasing to provide Plaintiff with the requisite products to fulfill contracts.

86.     As a result of Defendants' actions, Plaintiff suffered damages.

### Count Seven: Promissory Estoppel

87.     Plaintiffs hereby adopt and re-allege each and every allegation previously set forth in Paragraphs 1 through 49 of this Complaint as if fully set forth herein.

88.     To establish a claim for promissory estoppel the Plaintiff must show (1) defendant made a promise to plaintiff, (2) the plaintiff reasonably and substantially relied on the defendant's

promise to his detriment, (3) the defendant knew or should have known its promise would lead the plaintiff to some definite and substantial injury, and (4) injustice can be avoided only enforcing the defendant's promise.

89.    Defendant promised to provide "an uninterrupted source of supply, with sufficient quantities of product, for the duration of the base contract period and all option years".

90.    Plaintiff reasonably and substantially relied on the promise when it entered into the National Contract with the VA.

91.    Defendant  knew that Plaintiff was going to offer a proposal to the VA. The promise to supply was a requisite for the proposal.

92.    Injustice can be avoided only by enforcing defendant's promise to provide an uninterrupted source of supply.

### *Attorney's Fees*

93.    Plaintiffs hereby adopt and re-allege each and every allegation previously set forth in Paragraphs 1 through 49 of this Complaint as if fully set forth herein.

94.    Plaintiff is entitled to reasonable attorney's fees in a breach of contract suit. TEX. CIV. PRAC. & REM. CODE § 38.001.

95.    Plaintiff is also entitled to reasonable attorney's fees under 15 U.S.C. § 15.

### VI.    NOTICE AND CONDITIONS PRECEDENT

96.    All conditions precedent to maintaining this cause of action have been performed or have otherwise occurred.

### VII.    JURY DEMAND

97.     Plaintiff respectfully demands the right to have a trial by jury and has tended the appropriate jury fee to the Clerk of Court for the U.S. District Court for the Western District of Texas.

## VIII.   PRAYER

**WHEREFORE,** Plaintiff prays that Defendants be cited to appear and answer, and after trial and hearing, Plaintiff be granted the relief requested herein, and all such other relief to which it may show itself justly entitled at law or in equity.

Respectfully submitted,

THE VETHAN LAW FIRM, P.C.

By: /s/ Charles M.R. Vethan
    Charles M.R. Vethan
    Texas Bar No. 00791852
    820 Gessner Road, Ste. 1510
    Houston, TX 77024
    Telephone: (713) 526-2222
    Facsimile: (713) 526-2230
    Email: cvethan@vethanlaw.com
    Service email: edocs@vwtexlaw.com

    Joseph L. Lanza
    Texas Bar No. 00784447
    11459 Huebner, Suite 101
    San Antonio, Texas 78230
    Telephone: (210) 824-2220
    Fax: (713) 526-2230
    Email: jlanza@vethanlaw.com
    Service email: edocs@vwtexlaw.com

    ***Attorneys for Plaintiff***
    ***Spartan Medical, Inc.***